IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

RALPH HARRISON BENNING,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　CIVIL ACTION NO.  5:08-CV-435(MTT)
　　　　　　　　　　　　　　　　)
STATE OF GEORGIA, *et al.*,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　)
_____)

## ORDER

This matter is before the Court on the Defendants' Motion for Summary
Judgment (Doc. 71) and the Plaintiff's Motion for Summary Judgment (Doc. 72).  For
the reasons set forth below, the Defendants' Motion is granted in part and denied in
part, and the Plaintiff's Motion is denied.

## I.  Factual and Procedural Background

Pro se Plaintiff Ralph Harrison Benning is currently an inmate at Autry State
Prison in Pelham, Georgia.  Benning filed his complaint on December 11, 2008, against
the State of Georgia, the Georgia Board of Corrections (the "Board"), the Georgia
Department of Corrections ("GDOC"), and Commissioner Brian Owens, in his official
capacity, contending that the Defendants, by the enactment and enforcement of
grooming policies, violated the Religious Land Use and Institutionalized Persons Act
("RLUIPA"), 42 U.S.C. § 2000cc-1.  (Doc. 1).

In his complaint, Benning states that he is a "Torah-Observant Jew."  By virtue of his religion, Benning claims that he is forbidden from removing his earlocks.[1]  He alleges that the Defendants' refusal to allow him to grow his earlocks imposes a substantial burden on his religious exercise and that their refusal serves no compelling governmental interest.

Benning also claims that he is forbidden by his religion from using any type of razor or blade to remove his facial hair.  He is permitted, however, to use a depilatory to remove his facial hair.[2]  In light of Board of Corrections Rule 125-2-3-.04 and the GDOC grooming policy, which prohibit beards, Benning requested that the Defendants provide him with a depilatory in the same manner razors are provided to other prisoners for the purpose of removing his facial hair.  The Defendants refused to provide the depilatory, and Benning contends this refusal imposes a substantial burden on his religious exercise.  He also contends that there is no compelling governmental interest in refusing to provide him with a depilatory.

Benning bases his beliefs and understanding of Jewish laws and customs on the Code of Jewish Law, generally referred to as the *Kitzur Shulhan Arukh*.  (Doc. 87-1).  It is undisputed that the *Kitzur Shulhan Arukh* is an authoritative source of Jewish laws and customs.  Benning claims that Chapter 170 provides the basis for his beliefs at issue in this case.  Chapter 170 provides:

---

[1] In the context of this action, an earlock is a lock of hair worn in front of each ear by Hasidic and Yemenite Jewish males in accordance with a Biblical prohibition against clipping the hair at the temples.

[2] A depilatory is a preparation, usually a liquid or cream, that is used to remove unwanted hair from the body.

1. It is forbidden to shave off the hair of the temples on both sides of the head at their juncture with the cheeks at the ears.  According to some authorities, it is forbidden to cut them even with scissors, close to the skin, as with a razor.  Therefore, if it is necessary to shave off the hair from the temples for the sake of health, one must take care not to shave close to the skin.  The length of the earlocks is estimated to be from the forehead as far as below the ear, where the cheeks widen.

2. The Torah has forbidden to shave the "corners" of the beard with a razor only.  The beard has five "corners," and there are many opinions as to what they are.  Therefore, he who fears God, should not use a razor on any part of the beard, even on his upper lip or under the chin.  There is no difference between a razor and a sharp stone which cuts the hair, such as a pumice stone; they are both forbidden.  Those who remove their beard by means of a salve, should be careful not to scrape it off with a knife which might cut the hair; but they should use instead a strip of wood.

(Doc. 87-1).  Initially, it seemed that Benning contended that his religious beliefs prohibited cutting his earlocks at all.  However, he now acknowledges that Chapter 170 only prohibits shaving or closely cutting the hair of the temples and beard.  It is acceptable to trim the earlocks with scissors, for example, so long as the earlocks are not cut close to the skin.

Benning asks the Court to order the Defendants to allow him to grow his earlocks and to provide him with a depilatory free of cost in the same manner razors are provided to other inmates.  Both parties have moved for summary judgment.

## II.  DISCUSSION

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a

verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." *Id.*  The burden rests with the moving party to prove that no genuine issue of material fact exists. *Id.*

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(e).  This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex*, 477 U.S. at 323.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). The Court will consider each motion on its own merits, resolving all reasonable

-4-

inferences against the party whose motion is under consideration. *Am. Bankers Ins. Group*, 408 F.3d at 1331.

### A.    RLUIPA

In a broad bipartisan effort, Congress enacted RLUIPA, in part, to protect and accommodate the religious exercise of prisoners.  Under section 3 of RLUIPA,

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Section 3 of RLUIPA "affords to prison inmates a heightened protection from government-imposed burdens by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest."  *Smith v. Allen*, 502 F.3d 1255, 1266 (11th Cir. 2007) (internal quotation marks and citation omitted), abrogated on other grounds by *Sossamon v. Texas*, __ U.S. __, 131 S. Ct. 1651 (2011).  RLUIPA contains an express private cause of action allowing a person to assert "a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000cc-2(a).  The statute further defines "government" to include states, counties, municipalities, departments, agencies, their instrumentalities and officers, and persons acting under color of state law.  42 U.S.C. § 2000cc-5(4)(A).

Because Benning has not asserted claims for money damages, but rather seeks only injunctive relief, this Court need not address the issue which, until recently, has divided the courts of appeals—whether states waived their sovereign immunity to claims for monetary relief by accepting federal funds. *See Sossamon*, 131 S. Ct. 1651.

However, because the Defendants have, perhaps only in passing, asserted claims of immunity, the Court will address those arguments before addressing the substance of Benning's RLUIPA claim. Although the Supreme Court recently held in *Sossamon v. Texas*, that states, by accepting federal funds, do not consent to waive their immunity to suits for monetary damages under RLUIPA, that decision does not shield states from *all* potential suits and liability. RLUIPA unambiguously creates a private cause of action for "appropriate relief" against a "government," which is specifically defined to include states, state departments and agencies, and officials acting under color of state law. Thus, Benning's RLUIPA claim for injunctive relief is properly asserted against the State of Georgia, the Board, the GDOC, and Commissioner Brian Owens in his official capacity.[3]

To succeed on a claim under RLUIPA, a plaintiff must first establish a prima facie case. To establish a prima facie case under section 3 of RLUIPA, a plaintiff must demonstrate (1) that he engaged in a religious exercise; and (2) that the religious exercise was substantially burdened. *Smith*, 502 F.3d at 1276. If a plaintiff meets his burden of showing that the challenged government action substantially burdens the

---

[3] The Defendants also argue that the State of Georgia and the GDOC are not "persons" within the meaning of 42 U.S.C. § 1983, and therefore are not proper parties to this action. However, Benning has not asserted a section 1983 claim.

exercise of his religious beliefs, the government must then demonstrate that the imposition of the burden or refusal to accommodate a plaintiff's belief furthers a compelling government interest by the least restrictive means.  42 U.S.C. § 2000cc-1(a); 42 U.S.C. § 2000cc-2(b).  "[I]f the plaintiff fails to present evidence to support a prima facie case under RLUIPA, the court need not inquire into whether the governmental interest at stake was compelling."  *Smith*, 502 F.3d at 1276.[4]

      **i.**    **Religious Exercise**

The Supreme Court has cautioned that it is "not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretation of those creeds."  *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).  Thus, RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion … the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.

---

[4] The Defendants claim that Benning's RLUIPA claim is barred by the statute of limitations. (Doc. 71-1 at 6).  However, at oral argument, the Defendants agreed that because Benning seeks only injunctive relief, their statute of limitations defense was not applicable.  They maintain, however, their defense of laches which is mostly based on the same facts. Specifically, they claim that Benning was aware or should have been aware of the religious beliefs which form the basis of this action when he obtained his copy of the *Kitzur Shulhan Arukh* in the early 2000s.  Yet he did not request accommodation for the beliefs at issue here until many years later and after he had litigated other issues.  Benning argues that RLUIPA protects only sincerely held religious beliefs and that he did not hold these beliefs until approximately March 2008.  (Doc. 71-22 at 1-2).  The Court recognizes the potential for inmates to abuse rights afforded to them by RLUIPA.  However, the Defendants can point to little evidence that Benning has abused or sat on his rights and there certainly is insufficient evidence for the Court to hold as a matter of law that Benning's claims are barred by laches.

13 (2005).  Therefore, to be protected, a plaintiff must show that the practice he wishes to engage in is both sincerely held and rooted in religious belief.  *Id.* (citation omitted). Here, because the Defendants dispute that Benning's religious beliefs are sincerely held, the Court must first address this threshold inquiry before deciding whether Benning has established the remaining element of his prima facie case.

The source of Benning's understanding of the requirements and practices of Judaism is the *Kitzur Shulhan Arukh*, or Code of Jewish Law, which Benning has had in his possession since at least the early 2000s.  (Doc. 87-1).  As noted, Benning finds the beliefs at issue here in Chapter 170, which addresses shaving.

The Defendants do not dispute, nor could they, that the principles of growing earlocks and refraining from shaving with a razor or blade are "religious" in nature.  The prohibition against shaving one's earlocks is one of the more recognizable, although perhaps not common, tenets of Torah-Observant Judaism, and the Plaintiff has produced sufficient documentation that both of these beliefs are "rooted in religion." (Doc. 71-2 at 18-20; Doc. 87-1).  Rather, the Defendants dispute, quite vigorously, that Benning is in fact Jewish, as he claims, and that he sincerely holds these beliefs.

In support of this argument, the Defendants offer a detailed history of Benning's and his family's religious backgrounds.  It is undisputed that Benning's mother and father, Elizabeth Estelle Ramsey Benning and Bishop Francis H. Benning, were both devout Christians and members of Benning's father's church.  Although Benning claims his mother was Jewish by birth, thereby making him Jewish by birth as well, he does not dispute that she practiced Christianity her entire life.  (Benning 2005 Dep. at 13, 19-21).

In addition, the Defendants point out that upon entering the Georgia prison system in 1985, Benning was a self-proclaimed practicing Episcopalian.  (Benning 2005 Dep. at 28).  In 1989, the Defendants note, Benning's Christian beliefs were so strong that he challenged prison rules which required him to be housed with a non-Christian. (Benning 2005 Dep. at 60-61).  In further support of their claim that Benning's Jewish beliefs are not sincere, the Defendants cite the affidavit of Rabbi Ilan D. Feldman, an Orthodox Jewish rabbi who minsters to an Orthodox congregation in Atlanta, Georgia. (Feldman Aff. ¶ 5).  After reviewing several of Benning's depositions, Rabbi Feldman concluded that Benning "has not established that he is Jewish."  (Feldman Aff. ¶ 10). According to Rabbi Feldman, "Judaism does not allow one to convert simply by declaring him/herself to be Jewish," (Feldman Aff. ¶ 11), and Benning has admitted that he has not gone through a formal conversion process (Benning 2005 Dep. at 13).  The Defendants claim that Benning has a "track record of using his religion to garner special treatment" and that his "chosen religion varies depending upon what [he] feels he is able to get out of the situation."  (Doc. 71-1 at 9).

The Defendant's argument, however, is misplaced.  As the Second Circuit stated, "the question whether [a plaintiff's] beliefs are entitled to … protection turns on whether they are 'sincerely held,' not the 'ecclesiastical question' whether he is in fact a Jew under Judaic law."  *Jackson v. Mann*, 196 F.3d 316, 321 (2nd Cir. 1999) (dealing with a prisoner's claim under the Free Exercise Clause of the First Amendment).  In the Court's view, and for the reasons set forth in more detail below, there can be no question that Benning's beliefs are sincerely held.

In May 1998, Benning filed affidavits with the GDOC changing his religion of record to Judaism.  (Doc. 71-4).  Contrary to the Defendants' assertions, he has not changed his religion since then, and there is no material evidence of any conduct inconsistent with or contrary to his professed Jewish religiosity.  On the contrary, Benning has spent much of that time grieving and litigating issues related to his Jewish faith.[5]

Although the Court recognizes the very real possibility of an inmate adopting a particular religion or belief to obtain more favorable treatment or rather simply to harass prison staff with demands to accommodate his new faith, there is no evidence that Benning has been motivated by anything other than sincerely held beliefs.[6] Accordingly, the Court concludes that Benning's religious beliefs—that he is forbidden from shaving his earlocks and from shaving his beard with a razor or blade—are sincerely held.

---

[5] This is not Benning's first RLUIPA complaint.  In 2002, he filed suit against the State of Georgia and Department of Corrections officials claiming that they violated RLUIPA when they refused to allow him to wear a yarmulke and provide him with a kosher diet.  After the Eleventh Circuit ruled in *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), that RLUIPA was constitutional, the parties reached a settlement agreement that apparently allowed Benning to wear a yarmulke and the State began serving kosher food.  According to Benning, the State accommodates all his religious beliefs except those at issue in this case.

[6] The Court does not suggest that an inmate's religious beliefs cannot be questioned or examined.  For example, in *Gardner v. Riska*, __ Fed. Appx. __, 2011 WL 4389709 (11th Cir. 2011), an inmate who claimed to be Jewish alleged that prison officials violated RLUIPA when they refused to provide him with a kosher diet.  While asserting this claim, however, the inmate was purchasing non-kosher food from the prison commissary.  That, the Eleventh Circuit held, was sufficient to establish that the inmate's claimed religious beliefs were not sincerely held.

### ii.    Substantial Burden

As to the second element of the prima facie case, Benning alleges that the

Defendants' refusal to accommodate his requests in light of Board Rule 125-2-3-.04 and

the GDOC grooming policy effectuates a "substantial burden" on the exercise of his

religion.  Board Rule 125-2-3-.04 states, in relevant part:

> Inmates shall be furnished the basic necessities to maintain a high
> standard of personal cleanliness.  Necessities shall include, but be
> limited to, soap, razor blades or other shaving devices…. Each inmate
> shall have a conventional haircut.  Hair shall not be longer than three (3)
> inches; shall not extend beyond a point which would reach the collar on an
> ordinary shirt; and shall not cover any part of the ears or eyebrows.
> Inmates may wear sideburns no longer than a point even with the bottom
> of the ear canal.  Mustaches are permitted, but shall not extend beyond
> the edge of the mouth and must be kept neat and trimmed at all times.
> Goatees, beards, and similar facial adornments are prohibited, unless
> medically indicated.

(Doc. 71-17).  Inmates with medical profiles are allowed to shave with clippers, which

are provided free of cost, and inmates may purchase a depilatory cream from the

inmate commissary.  (Sumner Aff. ¶ 11).  Neither the Board Rules nor GDOC policy

allows for a religious exception to the grooming policy.  (Doc. 71-10 at 5).

Based on Board Rule 125-2-3-.04, the GDOC established Standard Operating

Procedure IIB01-0011, which mirrors, word for word, the relevant portion of the Board

Rule quoted above.  (Doc. 71-19).  Although the two rules or policies are identical, the

Court would be remiss if it did not point out that Benning is challenging the Board Rule,

rather than the GDOC SOP.[7]  However, because the Board Rule and the SOP are identical, and because both serve to establish the GDOC grooming policy, the Court is satisfied that the two are, for purposes of this action, interchangeable.

The Eleventh Circuit has defined a "substantial burden" as being "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."  *Smith*, 502 F.3d at 1277 (quotation marks and citation omitted).  "Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct."  *Midrash Sephardi, Inc., v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).  "[T]o constitute a 'substantial burden' on religious practice, the government's action must be 'more than … incidental' and 'must place more than an inconvenience on religious exercise.  That is, to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice."  *Smith*, 502 F.3d at 1277 (quoting *Midrash*, 366 F.3d at 1227).

With regard to Benning's earlock claim, the Defendants appear to accept that the grooming policy imposes a substantial burden on the exercise of that specific tenet of his religion.  They argue, however, that Benning's religion cannot be substantially burdened by their refusal to allow earlocks because he is allowed to practice his religion

---

[7] Indeed, this Court previously held that because the rule was established by the *Board*, as opposed to the *Department*, of Corrections, Benning was not required to exhaust his administrative remedies prior to filing suit.  This is because the Board, which is comprised of individuals appointed by the Governor, has the legal responsibility to adopt, establish, and promulgate rules and regulations governing the operation of the GDOC.  *See* O.C.G.A. § 42-2-6 and O.C.G.A. § 42-2-11.  Thus, rules established by the Board constitute matters over which the GDOC has no control and are therefore non-grievable.

in other ways.  This argument operates on the assumption that all aspects of Judaism are interchangeable, and it effectively asks the Court to weigh the "centrality" of one religious belief against another, a task RLUIPA expressly cautions against.  Accordingly, the Court concludes that Board Rule 125-2-3-.04 and its application to Benning substantially burdens the exercise of his religious beliefs.  Benning has therefore established a prima facie case with respect to the earlock claim.

With regard to the depilatory claim, Benning's argument is as follows: The Board Rule requires inmates, with very limited exceptions, to remove all facial hair.  The Board Rule further states that inmates will be provided the basic necessities, including razors and other shaving devices, needed to comply with the Rule.  Thus, because a depilatory is the only means for Benning to comply with the Board Rule without violating the tenets of his faith, Benning argues, the Defendants must provide him with a depilatory free of cost.

The Defendants deny that they should be required to purchase a depilatory for Benning.  First, citing the Supreme Court's decision in *Cutter v. Wilkinson*, the Defendants correctly note that "RLUIPA does not require a State to pay for an inmate's devotional accessories."  544 U.S. at 720 n. 8.  The Defendants claim that all religious materials that are required for observance of an individual's faith are donated to the GDOC from religious organizations and then given to the inmate free of charge.[8] (Horne Aff. ¶ 6).  Then, the Defendants claim that a depilatory is not a religious or devotional item, thus perhaps weakening their argument that, pursuant to *Cutter*, they

---

[8] Jewish inmates are provided religious materials through the Aleph Institute, a non-profit organization that provides support to Jewish prisoners throughout the United States.

are not required to purchase or subsidize the purchase of a depilatory for Benning.
(Doc. 71-1 at 11).  In the end, no party contends that a depilatory is a devotional
accessory.

The Defendants real argument is that they have neither hindered nor restricted
Benning from possessing, purchasing, or using a depilatory.  Because the GDOC offers
two types of depilatories for sale to inmates at its inmate commissaries, the Defendants
contend, they have not obstructed Benning from complying with the dictates of his faith.

The question then becomes whether forcing Benning to pay for a depilatory or to
obtain it from outside sources amounts to a substantial burden on the exercise of his
religious beliefs.  On this question, the Court concludes that Benning has not produced
sufficient evidence to create a genuine issue of material fact.  With regard to his
financial status, Benning states in a conclusory fashion that he has "no source of
income other than charity, which [ ] is not guaranteed or assured."  (Doc. 81 at 6).
However, the Defendants have produced evidence that Benning spent a total of
$2,026.53, or on average $28.95 per month, at inmate commissaries from January 2005
until October 2010.  (Doc. 71-2 ¶ 60-61; Doc. 71-13 ¶ 12-13).  Whether these funds
were received via charitable donation or whether Benning has a prison job is not clear.
It is clear, however, at least insofar as Benning has admitted as much and has offered
no evidence in rebuttal, that he regularly purchases items from the inmate commissary,
thus suggesting that requiring him to purchase a depilatory would not "significantly
hamper" his religious practice.  (Doc. 81-1 ¶ 60-61).

In *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008), the Eighth Circuit addressed a similar question when Patel, a prison inmate, was given the option of purchasing meals from the inmate commissary that complied with his religious-mandated diet. "While this option places a financial burden upon [Patel]," the court stated, "Patel has not shown that it is substantial. He only offers his single, vague and unsupported statement about the potential [prohibitive] cost, and the record offers no evidence regarding Patel's financial status." *Patel*, 515 F.3d at 814. The court found Patel had not offered sufficient evidence to create a question of material fact sufficient for a jury to find that his religious exercise had been substantially burdened. *Id.* (noting also that the record did not establish that Patel had exhausted alternative means of exercising his religious belief before seeking accommodation from the prison).

While it may seem to many, and to some courts,[9] that requiring an inmate to purchase his own food would work a substantial burden, the rationale of *Patel* is clearly applicable here. Benning has failed to show that requiring him to purchase a depilatory would impose more than an incidental burden upon the exercise of his religious beliefs. Moreover, he has not shown, nor has he alleged, that he has pursued any alternative means of acquiring a depilatory, such as through donations from the Aleph Institute, the non-profit organization that provides support to Jewish prisoners throughout the United States.

---

[9] *See, e.g., Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317-18 (10th Cir. 2010) (rejecting the notion that an indigent plaintiff was required to exhaust alternative means of practicing his religion by purchasing or obtaining donated kosher foods).

Nor does it necessarily follow from the fact that the Defendants provide razors to inmates that prison officials must provide a depilatory to Benning.  Under RLUIPA, the question is not whether Benning is being treated the same as other prisoners.  Rather, the question is whether the Defendants have substantially burdened the exercise of his religious beliefs.  Although a policy requiring prisoners to pay or receive by donation a requested accommodation so they can comply with GDOC regulations without running afoul of their religious beliefs might raise concerns in other situations, those concerns are not present here.  The burden at this stage of the RLUIPA analysis lies with Benning, and he has not shown that the Defendants have denied him a reasonable opportunity to practice his religion.  Accordingly, Benning has failed to establish a prima facie case with regard to the depilatory claim, and the Defendants are therefore entitled to summary judgment.

### iii.    Compelling Government Interests & Least Restrictive Means

Even though Benning has established a prima facie case with regard to his earlock claim, it does not necessarily follow that he is entitled to summary judgment or that he may proceed to trial.  Rather, the burden of proof shifts to the Defendants to demonstrate that the "imposition of the burden on that person is in furtherance of a compelling government interest."  42 U.S.C. § 2000cc-1(a).  Context is important in the application of the compelling government interest standard.  *Cutter*, 544 U.S. at 723.  In adopting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and

discipline, consistent with consideration of costs and limited resources."  *Id.* (quotation marks and citation omitted).  "At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements."  146 Cong. Rec. S7774-01, *S7775 (July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA) (quotation marks omitted).

In addition to identifying compelling government interests, the Defendants must establish that their Rule and accompanying decisions are the least restrictive means of furthering those interests.  42 U.S.C. § 2000cc-1(a).  A number of circuit courts have determined that in order to meet its burden on the RLUIPA least restrictive means test, the government must demonstrate that it has "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005); *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 40-41 (1st Cir. 2007) (reversing summary judgment in favor of the defendant because it failed to show that a blanket ban on all inmate preaching was the least restrictive means available to achieve its interest).

As noted, context is critical and it is important to make clear exactly what Benning contends.  The grooming policy allows inmates to grow sideburns to the bottom of the ear canal.  Earlocks are essentially sideburns that extend "as far as below the ear, where the cheeks widen."  Thus, the primary point of disagreement between the parties is the area between the bottom of Benning's ear canal and the bottom of his ear lobe, an area estimated, based on discussion and observation at oral argument, to be

less than one half inch in length.  The Defendants' alleged justification for seeking to regulate this area must be considered in this light.

The Defendants have identified several compelling interests they claim are furthered by strict adherence to the GDOC grooming policy and their refusal to allow Benning to grow his earlocks, including security, safety, and hygiene.  Although it is well established that security and safety, and perhaps even hygiene, are compelling government interests, the Defendants must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health, or safety in order to satisfy their burden.  *See Cutter*, 544 U.S. at 722-23.

Here, the Defendants argue that the grooming policy furthers the Defendants' interest in security by aiding prison officials' ability to easily identify inmates.  According to Steve Upton, the GDOC Facilities Operations Manager, "it is essential that every inmate be positively identified at all times.  An inmate's positive identification is essential (1) to monitor disciplinary infractions, (2) to ensure the correct inmates are transferred to a different prison or released, and (3) to assist in the prompt recapture of escapees." (Upton Aff. ¶ 9-12).  Upton testified that the grooming policy helps both in preventing inmates from hiding contraband and in achieving uniformity in dress and grooming, which he claims reduces gang activity.  (Upton Aff. ¶ 17-18).  Finally, the Defendants argue, the grooming policy promotes cleanliness and hygiene and reduces the risk of spreading head lice or other infectious disease.  (Upton Aff. ¶ 21).  According to Upton, "eliminating the Department of Corrections grooming policy [would not] adequately

address any of the[se] security concerns … but would instead make the prisons and the general public less safe."  (Upton Aff. ¶ 23).

The manner in which the Defendants have asserted the governmental interests they seek to protect highlights an important, yet often overlooked, issue in RLUIPA cases.  The Defendants mostly argue what compelling interests they have generally in the implementation of a grooming policy in their prisons.  By its express language, however, RLUIPA states that prisons cannot "impose a substantial burden on the religious exercise of a person … *even if the burden results from a rule of general applicability*, unless the government demonstrates that imposition of the burden *on that person*," i.e., Benning, furthers a compelling government interest by the least restrictive means.  42 U.S.C. § 2000cc-1(a).  RLUIPA therefore contemplates that claims brought under section 3 be analyzed similarly to "as-applied" constitutional challenges rather than facial challenges.   *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (concluding that RFRA, RLUIPA's predecessor, requires individualized review); *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 39 (1st Cir. 2007) (finding that the prison "must … establish that prison security is furthered by barring [the individual] from engaging in" the disputed conduct); *Washington v. Klem*, 497 F.3d 272, 285 (3d Cir. 2007) (finding the appropriate inquiry to be whether the government action is the least restrictive means as applied to the individual); *Koger v. Bryan*, 523 F.3d 789, 796, 800 (7th Cir. 2008) (noting that RLUIPA, unlike the First Amendment, requires individualized review).  Thus, the Defendants must not only justify the Board Rule and accompanying grooming policy as a whole, but they must also justify their refusal to grant Benning a religious-based exception.

The Court concludes that the Defendants have not met their burden of establishing that their refusal to allow Benning to grow his earlocks is the least restrictive means of furthering their interests in security, safety, and hygiene.  The Defendants cited justifications, in the form of affidavit testimony from Steve Upton, note only the broad interests served by the GDOC grooming policy in general.  They do not make the necessary individualized review required by RLUIPA.  General citations to other decisions from this and other circuits for the proposition that security is a compelling government interest, without more, do not satisfy the Defendants' burden.[10]

Although persuasive and instructive, none of the cases cited by the Defendants address the issues encountered by Georgia prisons when confronted with a Jewish inmate's request to grow earlocks.  While a request to grow a beard or long hair is, perhaps, similar to a request to grow earlocks, the reasoning applicable to a challenge concerning long hair or beards may not be applicable to a challenge concerning earlocks.  *See Odneal v. Pierce*, 324 Fed. Appx. 297, 301 (5th Cir. 2009) (noting that the differences between long hair and quarter inch beards altered the RLUIPA analysis and that the reasoning concerning one is not necessarily dispositive of the other).  This lack of clear precedent only amplifies the Defendants' failure to give Benning's

---

[10] For example, *Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996), which is now over fifteen years old, dealt with a Rastafarian inmate's challenge under the RFRA to the hair-length restrictions imposed by a maximum security facility within the Florida Department of Corrections.

requested accommodation the narrowly tailored, individualized review it deserves.[11] Thus, while the Defendants undoubtedly have a compelling interest in the safety and security of their prisons, they have not offered a sufficient basis to justify their concern that these interests will be compromised if they accommodate Benning's request. Indeed, they do not specifically address at all why Benning's earlocks will threaten their proposed governmental interests.

For the same reasons, the Defendants have not established that a uniform hairstyle policy for all GDOC inmates, with no allowance for religious-based exceptions, is the least restrictive means to further their interests in security, safety, and hygiene. The Defendants have addressed the least restrictive means test with little more than a citation to *Harris v. Chapman* and the cursory statement that "it is well settled that the State's shaving policy furthers a compelling interest in security and uses the least restrictive method to promote this compelling interest."  (Doc. 71-1 at 18; Doc. 79 at 17). The Defendants do not purport to have considered the efficacy of any less restrictive measures, nor have they explained, other than by citing to the same governmental interests, why inmates with certain medical profiles are exempted from compliance with the grooming policy but no religious exemptions are allowed.  Moreover, the Court notes merely by way of example that the Federal Bureau of Prisons permits inmates to select

---

[11] At one point, the Defendants even state that "the growth of even a short beard would obscure facial features and makes hundreds of decisions that correctional officials have to make each day more difficult.  When the prison staff must constantly be aware of the status of inmates beard length, certainly, the job of identification would be made more difficult."  (Doc. 71-1 at 16). Benning has not requested to grow a beard.  The Defendants' reference thereto was likely an error brought about by the fact that the majority of RLUIPA cases dealing with prison grooming policies have dealt with Muslim inmates' requests to grow beards and Native American inmates' requests to grow long hair.

the hairstyle of his or her personal choice, with no restrictions on either length or facial hair, so long as the hairstyle is kept "neat and clean" and does not interfere with food service or increase the likelihood of a work injury.  *See* Federal Bureau of Prisons Policy No. 5230.05.  The Court is not suggesting that the existence of a less restrictive policy in another prison is conclusive proof that the Defendants' policy is not the least restrictive means, but it does suggest that the Defendants have failed to seriously consider any possible alternatives.[12]

In short, the Defendants have once again failed to meet their burden, even in light of this Court's nearly identical ruling on the Defendants' motion to dismiss that they "certainly ha[d] not met [their] burden…, which requires more than mere assertions or conclusory statements that there is no less restrictive means available."  (Doc. 22 at 7).  The Defendants must "*demonstrate*, and not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest."  *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (emphasis in original).  The Defendants in this case have failed to do so.

Although the Defendants have clearly not met their burden and thus they are not entitled to summary judgment on this issue, neither is Benning.  He likely has established that the Defendants' blanket refusal to allow him to grow hair at his temples to the bottom of his ear lobe is not the least restrictive means to serve the Defendants'

---

[12] The Defendants did consider Benning's proposed amendment to Board Rule 125-2-3-.04, which proposed abolishing the GDOC grooming policy in its entirety.  (Doc. 71-21).  The Court agrees with the Defendants that Benning's proposed alternative is likely unworkable, but the Court is not convinced that the Defendants' duty to consider possible alternatives starts and stops with the lone alternative suggested by Benning.

interests.  If Benning were seeking damages only, he would likely be entitled to summary judgment on the issue of liability.  However, he has requested injunctive relief, and the record is not sufficient to allow the Court to determine the extent to which Benning can grow his earlocks without compromising the Defendants' legitimate interests.[13]  Accordingly, neither party is entitled to summary judgment.

### III. Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment is granted in part and denied in part.  With regard to the depilatory claim, the Defendants' Motion is granted, and with regard to the earlock claim, their Motion is denied.  Benning's Motion for Summary Judgment is denied.  This matter will be scheduled for a non-jury trial in accordance with this Order.

**SO ORDERED,** this 13th day of January, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[13] Indeed, at oral argument, Benning conceded that there may be a point at which the Defendants would have an interest in regulating the length of his earlocks.