IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

RALPH HARRISON BENNING,     )
     )
     Plaintiff,     )
     )
v.     )     CIVIL ACTION NO.  5:08-CV-435(MTT)
     )
STATE OF GEORGIA, *et al.*,     )
     )
     Defendants.     )
_____)

## ORDER

## I.  INTRODUCTION

Pro se Plaintiff Ralph Harrison Benning brought this action against the State of Georgia, the Georgia Board of Corrections (the "Board"), the Georgia Department of Corrections ("GDC"), and Commissioner Brian Owens in his official capacity, claiming that the Defendants violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, by refusing to allow him to grow earlocks in accordance with his religious beliefs.  Earlocks are hair growing from the area in front of the ears, sometimes to the point that they are truly locks.  They are often worn by males in the Orthodox Jewish community.  On January 13, 2012, the Court entered an order on the parties' cross-motions for summary judgment.  (Doc. 92).  In that order, the Court granted summary judgment to the Defendants on Benning's second RLUIPA claim, in which he contested the Defendants' refusal to provide him a depilatory[1] free of cost, but

_____

[1] A depilatory is a preparation, usually a liquid or cream, which is used to remove unwanted hair from the body.

denied both parties' motions for summary judgment on Benning's earlocks claim.  With regard to the earlocks claim, the Court ruled that Benning had established a prima facie case under RLUIPA, but that there was a genuine issue of material fact as to whether the Defendants' refusal to allow Benning's earlocks furthered a compelling governmental interest by the least restrictive means.  Benning's earlocks claim is the sole remaining claim before the Court.

Benning seeks only equitable relief and the parties agreed that the case should be tried to the Court.  Trial began, and ended, on March 21, 2012.  Benning testified and he called inmates Michael Baker and Howard McKenzie to testify.  Benning also introduced numerous exhibits.  The Defendants introduced several exhibits of their own and presented testimony from one GDC administrator: Deputy Director of Facility Operations Johnny Sikes.  The parties made brief closing arguments, and the Court took the matter under advisement.  For the reasons set forth below, the Court now enters judgment in favor of the Plaintiff.  This opinion serves as the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

## II.  FACTUAL BACKGROUND

Plaintiff Ralph Benning is currently an inmate at Autry State Prison, a medium-security facility operated by the GDC.  Benning, who is serving a life sentence for murder, professes to be a "Torah-Observant Jew."  When Benning first entered the Georgia prison system in 1985, he was a practicing Episcopalian.  In 1998, however, Benning filed affidavits with the GDC changing his religion of record to Judaism.

Benning has not changed his religion since then, and there is no material evidence of any conduct inconsistent with or contrary to his professed Jewish religiosity.

During his incarceration, Benning has sought and received several accommodations from the GDC that allow him to practice certain facets of his religion. In 2002, Benning filed a lawsuit against the State of Georgia and GDC officials claiming that they violated RLUIPA by refusing to allow him to wear a yarmulke and to provide him with a kosher diet.  After the Eleventh Circuit ruled in *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), that RLUIPA was constitutional, the parties reached a settlement allowing Benning, and all other inmates, to wear religious head coverings at all times and the GDC began serving kosher food.  The GDC has also accommodated Benning's religion in other ways: he is allowed to receive special food packages during religious holidays; he is provided a special location where he can pray undisturbed; he is allowed into the kitchen to prepare his own meals; he is allowed special ritual items such as a ram's horn that he sounds on certain holidays; and he is allowed to light candles when required for religious observance.

The GDC also accommodates other religious groups.  Native Americans, for example, are allowed to wear headbands and a two inch by two inch medicine bag in which they are allowed to store feathers, shells, stones, and other sacred items.  (Doc. 113-10) (This document, marked as Plaintiff's Exhibit 17, is the GDC "Standard Operating Procedure" for the subject of "Native American Guidelines."  Citing RLUIPA, and other sources, the SOP lists a number of accommodations for "religious paraphernalia and authorized practices").  Some religious groups are allowed to possess tobacco and communion wine, in contravention of general GDC policy.

Benning cites tobacco as a particularly good example of the Defendants' ability to accommodate potentially problematic religious practices.  Benning testified that since the GDC banned all tobacco products, tobacco has become a valuable black market commodity, and the tobacco trade has "directly impacted" security.  Yet the GDC has been able to accommodate tobacco use by Native Americans.  According to Deputy Director of Facility Operations Sikes, the GDC is able to implement these accommodations into their normal operating procedure with minimal disruption when ordered to do so by a court or when otherwise necessary.

Benning believes, based on his religious beliefs, that he is forbidden from cutting his earlocks.  Benning bases his beliefs and understanding of Jewish laws and customs on the Code of Jewish Law, generally referred to as the *Kitzur Shulhan Arukh*.  (Doc. 87-1).  The Defendants do not dispute that the *Kitzur Shulhan Arukh* is an authoritative source of Jewish laws and customs.  Chapter 170 of the *Kitzur Shulhan Arukh* provides the basis for the belief at issue in this case.  Chapter 170 provides:

> 1. It is forbidden to shave off the hair of the temples on both sides of the head at their juncture with the cheeks at the ears.  According to some authorities, it is forbidden to cut them even with scissors, close to the skin, as with a razor.  Therefore, if it is necessary to shave off the hair from the temples for the sake of health, one must take care not to shave close to the skin.  The length of the earlocks is estimated to be from the forehead as far as below the ear, where the cheeks widen.

(Doc. 87-1).

Citing GDC Standard Operating Procedure IIB01-0011 (the "grooming policy"), and the Board of Corrections Rule it was modeled after, the Defendants refuse to allow Benning to grow earlocks.  The grooming policy states, in relevant part:

> Each inmate shall have a conventional haircut.  Hair shall not be longer than three (3) inches; shall not extend beyond a point which would reach the collar on an ordinary shirt; and shall not cover any part of the ears or eyebrows.  **Inmates may wear sideburns no longer than a point even with the bottom of the ear canal.**  Mustaches are permitted, but shall not extend beyond the edge of the mouth and must be kept neat and trimmed at all times.  Goatees, beards, and similar facial adornments are prohibited, unless medically indicated.

(Doc. 71-17) (emphasis added).  The Defendants contend that earlocks would not comply with the grooming policy as written and therefore are not allowed.

Inmates with medical "profiles," particularly those with a condition called pseudofolliculitis barbae which makes shaving difficult, are sometimes exempted from the grooming policy.  Neither the Board Rules nor GDC policy allows for a religious exception to the grooming policy.

Both the Plaintiff and the Defendants, but particularly the Defendants, seem unable to grasp that their area of dispute, both literally and figuratively, is narrow.  The Defendants contend that Benning's sideburns should stop at the middle of his ear canal.  Benning contends that his religious beliefs require him not to shave above the bottom of his earlobe.  With regard to the length of the hair from the forehead to the bottom of his earlobe, Benning contends that his religious beliefs would be appropriately accommodated if he could grow hair in that area to a length of three inches at which point it would be trimmed with scissors.  Thus, Benning is not contending, as the Defendants have asserted, that he can grow his earlocks as long as he pleases.  On the other hand, it is significant that Benning concedes that Chapter 170 does not prohibit cutting earlocks with scissors.  Rather, it bars the shaving of the area between the forehead and the bottom of the earlobe.  He offers no evidentiary basis for any religious

belief that earlocks must grow to a length of three inches.  Indeed, the *Kitzur Shulhan Arukh* does not specifically address length or appearance of earlocks.  It only forbids the shaving or cutting with scissors, "close to the skin, as with a razor."

### III. DISCUSSION

#### A.    RLUIPA

Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise" of prisoners "unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  To succeed on a claim under RLUIPA, a plaintiff must first establish a prima facie case.  To establish a prima facie case under RLUIPA, a plaintiff must demonstrate (1) that he engaged in a religious exercise; and (2) that the religious exercise was substantially burdened.  *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007).  If a plaintiff meets his burden of showing that the challenged government action substantially burdens the exercise of his religious beliefs, the government must then demonstrate (1) that the imposition of the burden or refusal to accommodate a plaintiff's belief furthers a compelling government interest (2) by the least restrictive means.  42 U.S.C. § 2000cc-1(a); 42 U.S.C. § 2000cc-2(b).

#### i.    Religious Exercise

The Supreme Court has cautioned that it is "not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretation of those creeds."  *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).

Thus, RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion … the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).  Therefore, to be protected, a plaintiff must show that the practice he wishes to engage in is both sincerely held and rooted in religious belief.  Here, because the Defendants initially disputed that Benning's religious beliefs are sincerely held, the Court will address this threshold inquiry before deciding whether Benning has established the remaining element of his prima facie case.

The source of Benning's understanding of the requirements and practices of Judaism is the *Kitzur Shulhan Arukh*, which Benning has had in his possession since at least the early 2000s.  (Doc. 87-1).  As noted, Benning finds the belief at issue here in Chapter 170, which addresses shaving.

The Defendants do not dispute, nor could they, that the practice of growing earlocks is "religious" in nature.  The growing of earlocks is one of the more recognizable, although perhaps not common, tenets of Torah-Observant Judaism, and the Plaintiff has produced sufficient documentation that this belief is "rooted in religion." However, the Defendants do dispute that Benning is in fact Jewish, as he claims, and that he sincerely holds this belief.

In support of this argument, the Defendants offer a detailed history of Benning's and his family's religious backgrounds.  It is undisputed that Benning's mother and

father, Elizabeth Estelle Ramsey Benning and Bishop Francis H. Benning, were both devout Christians and members of Benning's father's church.  Although Benning claims his mother was Jewish by birth, thereby making him Jewish by birth as well, he does not dispute that she practiced Christianity her entire life.  (Doc. 71-3 at 14, 19-22).

In addition, the Defendants point out that upon entering the Georgia prison system in 1985, Benning was a self-proclaimed practicing Episcopalian.  (Doc. 71-3 at 29).  In 1989, the Defendants note, Benning's Christian beliefs were so strong that he challenged prison rules which required him to be housed with a non-Christian.  (Doc. 71-3 at 61-62).

In further support of their claim that Benning's Jewish beliefs are not sincere, the Defendants cite the affidavit of Rabbi Ilan D. Feldman, an Orthodox Jewish rabbi who minsters to an Orthodox congregation in Atlanta, Georgia.  (Doc. 71-6 at ¶ 5).  Rabbi Feldman did not testify at trial (his affidavit was offered in support of the Defendants' motion for summary judgment), but, even if he had, his opinions do not lead to the conclusion the Defendants urge.  After reviewing transcripts of Benning's depositions, Rabbi Feldman concluded that Benning "has not established that he is Jewish."  (Doc. 71-6 at ¶ 10).  According to Rabbi Feldman, "Judaism does not allow one to convert simply by declaring him/herself to be Jewish," (Doc. 71-6 at ¶ 11), and Benning has admitted that he has not gone through a formal conversion process (Doc. 71-3 at 14).

The Defendant's argument is misplaced.  As the Second Circuit stated, "the question whether [a plaintiff's] beliefs are entitled to … protection turns on whether they are 'sincerely held,' not on the 'ecclesiastical question' whether he is in fact a Jew under

Judaic law." *Jackson v. Mann*, 196 F.3d 316, 321 (2nd Cir. 1999) (dealing with a prisoner's claim under the Free Exercise Clause of the First Amendment).

In the Court's view, there can be no question that Benning's beliefs are sincerely held.  In May 1998, Benning filed affidavits with the GDC changing his religion of record to Judaism.  (Doc. 71-4 at 11-12).  Contrary to the Defendants' assertions, he has not changed his religion since then, and there is no material evidence of any conduct inconsistent with or contrary to his professed Jewish religiosity.  On the contrary, Benning has spent much of that time requesting accommodation on issues related to his Jewish faith.  Although the Court recognizes the very real possibility of an inmate adopting a particular religion or belief to obtain more favorable treatment or simply to harass prison staff with demands to accommodate his new faith, there is no evidence that Benning has been motivated by anything other than sincerely held beliefs.[2]

Accordingly, the Court finds that Benning's religious belief – that he is forbidden from shaving his earlocks – is sincerely held.

### ii.   Substantial Burden

With regard to the second element of the prima facie case, Benning alleges that the Defendants' refusal to allow him to grow earlocks effectuates a "substantial burden" on the exercise of his religion.  The Eleventh Circuit has defined a "substantial burden"

---

[2] The Court does not suggest that an inmate's religious beliefs cannot be questioned or examined.  For example, in *Gardner v. Riska*, 444 Fed. Appx. 353 (11th Cir. 2011), an inmate who claimed to be Jewish alleged that prison officials violated RLUIPA when they refused to provide him with a kosher diet.  While asserting this claim, however, the inmate was purchasing non-kosher snacks from the prison commissary.  That, the Eleventh Circuit held, was sufficient to establish that the inmate's claimed religious beliefs were not sincerely held.

as "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Smith*, 502 F.3d at 1277 (internal quotations and citation omitted). "Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Midrash Sephardi, Inc., v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004). "[T]he government's action must be 'more than … incidental' and 'must place more than an inconvenience on religious exercise.' That is, to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice." *Smith*, 502 F.3d at 1277 (quoting *Midrash*, 366 F.3d at 1227).

Analysis of this element is straightforward, and the Defendants have essentially conceded that the grooming policy and its application to Benning impose a substantial burden on the exercise of that specific tenet of his religion. At trial, they offered no evidence and no new argument on the issue, apparently accepting the Court's analysis in its order on the parties' cross-motions for summary judgment.[3] Benning wishes to exercise his religion by growing earlocks, and he has established that this practice constitutes a "religious exercise" for purposes of RLUIPA. The Defendants, citing the GDC grooming policy, refuse to allow him to do so. Thus, as a direct result of the Defendants' refusal, Benning is prevented from exercising this religious belief.

---

[3] At summary judgment, the Defendants argued that Benning's religion could not be substantially burdened by their refusal to allow earlocks because he is allowed to practice his religion in other ways. This argument operates on the assumption that all aspects of Judaism are interchangeable, and it effectively asks the Court to weigh the "centrality" of one religious belief against another, a task RLUIPA expressly cautions against.

Accordingly, the Court finds that Benning's religious beliefs are substantially burdened by the Defendants' refusal to allow him to grow earlocks.  Benning has established a prima facie case.

### iii.    Compelling Governmental Interests & Least Restrictive Means

Because Benning has established a prima facie case, the burden shifts to the Defendants to demonstrate that the "imposition of the burden on [Benning] is in furtherance of a compelling government interest."  42 U.S.C. § 2000cc-1(a).  Context is important in the application of the compelling government interest standard.  *Cutter*, 544 U.S. at 723.  In adopting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Id.* (internal quotations and citation omitted).  "At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements."  146 Cong. Rec. 7774-01, *S7775 (July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA) (internal quotations omitted).

In addition to identifying compelling government interests, the Defendants must establish that their refusal to accommodate Benning is the least restrictive means of furthering those interests.  42 U.S.C. § 2000cc-1(a).  A number of circuit courts have determined that in order to meet its burden on the RLUIPA least restrictive means test, the government must demonstrate that it has "actually considered and rejected the

efficacy of less restrictive measures before adopting the challenged practice."
*Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005) (challenge to the California
Department of Corrections' grooming policy, which required male inmates to maintain
hair no longer than three inches); *Couch v. Jabe*, __ F.3d __, 2012 WL 1655411 at *5
(4th Cir. 2012) (stating that defendants must acknowledge and give consideration to
less restrictive alternatives).  While there is no doubt that prison officials may, in
appropriate circumstances, substantially burden a prisoner's ability to engage in
religious exercises, "the mere assertion of security or health reasons is not, by itself,
enough for the Government to satisfy the compelling governmental interest
requirement."  *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007); *see also Spratt v.
R.I. Dep't of Corr.*, 482 F.3d 33, 40 (1st Cir. 2007) (stating that while "prison officials are
to be accorded substantial deference in the way they run their prisons, this does not
mean that we will rubber stamp or mechanically accept the judgments of prison
administrators").  The Defendants must "*demonstrate*, and not just assert, that the rule
at issue is the least restrictive means of achieving a compelling governmental interest."
*O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (emphasis in original).

At trial, the Defendants elicited mostly nonspecific testimony from Deputy
Director of Facility Operations Sikes that the grooming policy and its application to
Benning are necessary to achieve several compelling State interests.  The Court will
address each of those claimed interests.

The majority of Sikes' testimony addressed the Defendants' asserted interest in
"uniformity."  Sikes testified generally that the grooming policy promotes uniformity
within the prisons, which in turn promotes order and discipline, which ultimately leads to

a safe and secure environment both for inmates and for GDC staff.  Sikes also testified that gang activity within the prisons is widespread.  Uniform application of the grooming policy, the Defendants claim, eliminates a potential gang identifier and provides GDC staff with a consistent means to enforce the policy so that facial hair does not become a point of contention between inmates and officers.

Sikes stressed repeatedly that earlocks are not within the "guidelines" as a "conventional" haircut and thus could not be allowed.  That the grooming policy bans earlocks, of course, is not a new discovery; were they allowed, Benning would not have filed suit seeking accommodation.  Presumably, what Sikes meant was that earlocks would compromise the Defendants' interest in uniformity.  This bare assertion – that a grooming policy prohibiting earlocks furthers the Defendants' interest in uniformity – is not particularly persuasive.  While the policy does achieve uniformity by placing certain limits on permissible hairstyles, thereby keeping all inmate hairstyles somewhat similar, the importance of this interest has not been adequately explained, particularly given the slight adjustment of the grooming policy necessary to accommodate Benning's request.

Indeed, the evidence establishes that the Defendants' interest in uniformity does not require strict and universal compliance with the grooming policy.  GDC policy allows all manner of religious head gear, including yarmulkes for Jewish inmates and headbands for Native Americans, both of which can be used to hide contraband and both of which "distinguish" those who wear them, thus undermining the Defendants' alleged interest in uniformity.  Put simply, any religious accommodation not expressly contemplated by GDC standard operating procedure impinges the Defendants' interest

in uniformity, yet the Defendants regularly accommodate inmates' religious requests, and they note no adverse effects that have resulted.

For example, Benning testified that when he first requested to wear a yarmulke, he was not permitted to do so because it would compromise the same interests the Defendants have asserted in this case.  Benning claims that he is now allowed to wear his yarmulke at all times, and none of the pitfalls identified by the Defendants ever materialized.[4]  Sikes did not rebut Benning's claim nor did he testify to the contrary. Instead, Sikes agreed that when the GDC makes accommodations for various religious practices, those accommodations, and the attendant departure from uniformity standards, are worked into the GDC's standard operating procedure with little or no disruption.  The Court does not doubt that uniformity, generally speaking, is important to prison officials, some more than others.[5]  However, the Defendants offer no evidence that allowing Benning to grow, to some degree, earlocks threatens any specific interest served by their preference for uniformity.

The Defendants next argue that the grooming policy furthers their interest in security by aiding prison officials' ability to easily identify inmates.  An inmate's

---

[4] Benning did recount one instance in which another inmate wanted the hard-boiled eggs Benning is allowed to eat during Passover.  According to Benning, after he explained that the eggs were required for religious observance, the inmate "had no problem with it."

[5] Indeed, a majority of states permit long hair, beards, or a religious exemption from the grooming policy.  *See, e.g.*, Ohio Revised Code § 5120-9-25 (allowing an exemption for religious accommodation in the event the grooming restrictions substantially burden an inmate's sincerely held religious belief); *see also* Pennsylvania Department of Corrections Policy No. DC-ADM 807 (allowing beards and a provision under which inmates can apply for a religious exemption from the grooming policy).

identification is essential, Sikes claimed, to controlling the movement of inmates within and amongst the various GDC facilities and in assisting in the recapture of escaped inmates.[6]  According to Sikes, chaos would result if inmates were allowed "to take on their own identity through changing their appearance with facial hair and the way they dress."  Again, however, Sikes made no effort to explain how earlocks, specifically, threaten the Defendants' ability to readily identify inmates.

In response, Benning cites the testimony of Howard McKenzie, a former deputy sheriff who has been incarcerated since 1997 for an armed robbery.  McKenzie confirmed the somewhat obvious fact that earlocks, rather than making identification more difficult, would actually make it easier to identify an inmate.  More importantly, on cross-examination Benning asked Sikes numerous times how earlocks would affect his identification, either within the prison or in the hypothetical scenario of his escape.  After giving several less-than-clear answers, Sikes finally conceded that the change in appearance – whether from initially growing earlocks or from shaving them – would not be "drastic."

Sikes also testified about the possibility that a change in an inmate's appearance could make it difficult to identify the inmate from the photograph on the inmate's GDC-issued identification card.  However, this concern is addressed by a GDC procedure requiring periodic review of identification cards "to determine if a new card is needed based on either the poor condition of the card or due to significant changes in the

---

[6] If facial hair was allowed, the theory goes, an escaped inmate could quickly change his appearance by shaving his facial hair, thus preventing, or at minimum delaying, recapture.

physical appearance of the inmate." (Doc. 114-7). Clearly, the GDC has made allowance for the fact that because of hair growth, hair loss, mustaches, and a variety of other reasons, an inmate's appearance may change.[7]

In short, the Defendants offer no evidence, and ultimately not even an argument, that earlocks would make identification more difficult. While it may be that some deviations from the grooming policy, e.g., long hair or beards, could make identification sufficiently difficult that prisons could justify not accommodating a prisoner's religious belief, the Defendants have not met their burden of demonstrating that earlocks fall in that category.

The Defendants also contend that the grooming policy is necessary because "long hair" could potentially be used to conceal contraband, such as razor blades or handcuff keys. Sikes claimed that "the longer the hair the greater the security risks," apparently because it would be burdensome if officers had to conduct more extensive pat down searches to ensure that nothing was hidden in a prisoner's hair.

To make this point, the Defendants tendered Exhibits 9, 10, and 11. (Docs. 114-1, 114-2, &114-3). Exhibit 9 shows a man wearing a wide-brimmed hat, with a long, full beard, and long, unkempt earlocks. Exhibit 10 shows a man with a thick beard and short, curled earlocks. Exhibit 11 shows a man wearing a hat, with a long, full beard, and earlocks wrapped around his ears. These exhibits were shown to Sikes, who

---

[7] The significance of this concern is undercut somewhat by the fact that Benning's photograph on the GDC's website depicts Benning with a mustache and without eyeglasses. In Benning's two appearances in this Court on November 16, 2011 and March 21, 2012, he has not had a mustache and has worn what appeared to be prison issue eyeglasses.

testified that the hair depicted in Exhibits 9 and 11 presented severe and dire security risks because of the "potential to hide contraband in the hair lengths and facial hair lengths of these two." This testimony reflects a recurring problem with the Defendants' evidence and argument; it bears no relationship to Benning's request. Benning has not asked to grow shaggy hair, a scraggly beard, or long, flowing earlocks. In the end, Sikes never testified that Benning's request to grow earlocks would burden officers searching for contraband. On the other hand, Benning elicited testimony from former deputy now inmate McKenzie that relatively short earlocks would not materially affect the ability of officers to search for contraband.

Moreover, Sikes only testified that it would take slightly longer to search inmates with "long hair;" he did not explain or quantify the burden this would place on the GDC or its officers. Unlike in other cases, the Defendants do not contend that GDC prisons are overcrowded or understaffed, thereby creating an unmanageable strain on resources by requiring GDC staff to conduct more time-consuming searches.[8]

Finally, during cross-examination Sikes admitted that the GDC allows inmates "any number of things" in which contraband can be hidden. Native Americans, for example, are allowed medicine bags. Sikes admitted that inmates could more easily

---

[8] Indeed, the Defendants apparently decided not to cite overcrowded conditions as a justification for refusing to accommodate Benning's request to grow earlocks. For example, Sikes testified that the GDC has empty beds throughout the system to move inmates around when needed. This perhaps runs counter to the general perception that Georgia's prisons are overcrowded. In any event, even if the Defendants had adduced evidence of overcrowding, there was no evidence that earlocks, grown to a reasonable length, would have any impact on the time required for inmate pat downs.

conceal contraband in medicine bags and that medicine bags are more time-consuming to search than earlocks.

In short, Sikes offered no testimony that short earlocks, as opposed to long hair or beards, raise any security concerns.  On the contrary, when questioned by the Court, Sikes acknowledged that sideburns extending to the bottom of the earlobe would not "concern us that much, other than it is not in keeping with the language in the posted standard within our current grooming policy …."

Finally, Sikes testified that the grooming policy promotes cleanliness and hygiene by preventing the admittedly rare case of head lice or other infectious disease. However, even on direct examination, Sikes admitted that earlocks extending three inches from the bottom of the earlobe would not present hygiene or health issues.

While the Defendants undoubtedly have a compelling interest in the safe, secure, and orderly operation of their prisons, they have not offered a sufficient basis to justify their concern that these interests will be compromised if they accommodate Benning's request.  The Court notes again what this case does not involve.  It does not involve long hair or full beards or other significant deviations from a grooming policy.  In cases involving such matters, defendants have advanced detailed and specific reasons explaining why compelling interests would be impinged.  *See, e.g.*, *Limbaugh v. Thompson*, 2011 WL 7477105 (M.D. Ala.), *adopted by Knight v. Thompson*, 2012 WL 777274 (M.D. Ala.) (finding, in light of extensive, unrebutted evidence that the Alabama DOC was severely overcrowded and understaffed, that a grooming policy prohibiting long hair furthered the defendants' interest in order and discipline).  Here, the

Defendants' evidence consists of broad suppositions regarding general problems facing the GDC, with no particular emphasis or focus on the grooming policy, Benning's request, and the potential effects of accommodating that request.  Accordingly, the Court finds the Defendants have failed to prove that their blanket refusal to allow Benning to grow earlocks is in furtherance of a compelling governmental interest.

In light of the Court's finding above, it almost necessarily follows that the GDC grooming policy prohibiting earlocks is not the least restrictive means of serving the Defendants' interests.  The Defendants do not purport to have considered the efficacy of any less restrictive measures, nor have they explained, other than by citing the same governmental interests, why inmates with certain medical profiles are exempted from compliance with the grooming policy but no religious exemptions are allowed.[9]  Further, Sikes testified that he was not familiar with the grooming policies in other jurisdictions, such as the Federal Bureau of Prisons' policy permitting inmates to select the hairstyle of his or her personal choice, with no restrictions on either length or facial hair, so long as the hairstyle is kept neat and clean and does not interfere with food service or increase the likelihood of a work injury.  *See* Federal Bureau of Prisons Policy No. 5230.05.  The Court acknowledges that the existence of less restrictive policies in other prisons is not necessarily proof that the Defendants' policy is not the least restrictive, but Sikes' acknowledgment that he is unfamiliar with other prisons' practices in this area

---

[9] The only alternative the Defendants appear to have considered, in a moment of pique, is abolishing the grooming policy in its entirety, an option the Court agrees is unworkable. RLUIPA does not require prison officials to throw the baby out with the bath water.  It does require them to consider less restrictive means to achieve their compelling interests.

does suggest that the Defendants have failed to seriously consider any possible alternatives.

Accordingly, to the extent the GDC grooming policy generally serves compelling governmental interests, the Defendants have failed to prove that banning earlocks completely is the least restrictive means of furthering those interests.

## IV. CONCLUSION

RLUIPA reflects a bipartisan effort by Congress to afford broad protection to inmates' religious beliefs.  RLUIPA's strict scrutiny standard requires prison officials to demonstrate why compelling interests compel them to refuse accommodation of those religious beliefs.  Nevertheless, courts should generally defer to prison officials, given their experience and expertise in prison administration.

Here, however, the Defendants offer nothing to which the Court can defer.  They have not shown, and have largely made little or no effort to show, that their asserted interests are materially impacted by Benning's request to grow earlocks.  Nor have they considered, in any meaningful way, a less restrictive means to serve those interests.

Accordingly, the Court, as the finder of fact, finds for the Plaintiff.  The Defendants are enjoined from enforcing the GDC grooming policy in a way that completely bans Benning from growing earlocks.  Specifically, the Defendants shall not require Benning to shave the area between his forehead and the bottoms of his earlobes.  The Defendants can require that Benning's earlocks be trimmed with scissors, but they may not require that the earlocks be trimmed "close to the skin, as with a razor."  Other than that, the Court does not, at this time, propose to regulate the

precise length of Benning's earlocks.  Although Benning believes that allowing his earlocks to grow to a length of three inches will accommodate his beliefs, the evidence does not require the conclusion that, as a matter of religious belief or doctrine, that length is appropriate.  Given the Court's rulings, reasonable parties should be able to reach accommodation and understanding on such matters.  If not, the Court will, reluctantly but expeditiously, address that issue.

**SO ORDERED,** this 23rd day of May, 2012.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT